JUSTICE TRIEWEILER
dissenting.
I dissent from the majority opinion.
What is notably absent from the hearing examiner’s decision, the District Court’s decision, or the majority opinion, is any mention of the enabling statute pursuant to which medical services are reimbursed by the Medicaid program. While I do not disagree with the majority’s analysis of the evidence in this case as applied to the nearly indecipherable MIPS criteria, I do conclude that the Administrative Rule pursuant to which those criteria were developed was neither consistent with nor reasonably necessary to effectuate the purpose of its enabling statute, and therefore, was ineffective. For these reasons, I would reverse the decision of the District Court and remand to the hearing examiner for consideration of the evidence as applied to the *165 only true requirement for Medicaid reimbursement which is established by statute.
The enabling statute for the Administrative Rules relied on by the department, the hearing examiner, the District Court and the majority is set forth at § 53-6-101, MCA, which provides as follows:
(1) There is a Montana medicaid program established for the purpose of providing necessary medical services to eligible persons who have need for medical assistance. The Montana medicaid program is a joint federal-state program administered under this chapter and in accordance with Title XIX of the federal Social Security Act (42 U.S.C. 1396, et seq.), as may be amended. The department of social and rehabilitation services shall administer the Montana medicaid program.
(2) Medical assistance provided by the Montana medicaid program includes the following services:
(а) inpatient hospital services;
....
(3) Medical assistance provided by the Montana medicaid program may, as provided by department rule, also include the following services:
....
(k) inpatient psychiatric hospital services for persons under 21 years of age;
....
(б) The services provided under this part may be only those that are medically necessary and that are the most efficient and cost-effective.
(Emphasis added.)
In other words, the Department may, by departmental rule, decide whether or not services for inpatient psychiatric care are reimbursed. However, the criteria for reimbursement are established by subparagraph (6) and provide only two requirements:
(1) that the services be medically necessary, and
(2) that they be the most efficient and cost-effective means of treatment.
Rule 46.12.590, ARM (1990), upon which the hearing examiner’s decision is based and pursuant to which that decision was affirmed by this Court was enacted pursuant to § 53-6-101(3)(k), MCA. However, it adds to the statutory criteria an additional requirement for *166 reimbursement of inpatient psychiatric services. It provides in sub-paragraph (k):
“Hospital inpatient psychiatric care” means hospital based active psychiatric treatment provided under the direction of a physician. The individual’s psychiatric condition must be of such a nature as to pose a significant danger to self, others, or the public safety, or one which has resulted in marked psychosocial dysfunction or grave disability of the individual. The therapeutic intervention or evaluation must be designed to achieve the patient’s discharge from inpatient hospital status to a less restrictive environment at the earliest possible time.
(Emphasis added.)
The underlined portion of subparagraph (k) adds an additional requirement to the statutory requirements for reimbursement of in-patient psychiatric care. It is, therefore, inconsistent with its enabling statute and is unenforceable.
In Michels v. Department of Social and Rehabilitation Services (1980), 187 Mont. 173, 177-78, 609 P.2d 271, 273, we stated that:
Whatever force and effect the regulation has must derive from the statute under which it is enacted, and a regulation in conflict with that statute is without effect. See, 2 Am. Jur. 2d Administrative Law § 289, and Bell v. Department of Licensing (1979), 182 Mont. 21, 594 P.2d 331, 36 St. Rep. 880. “It is axiomatic that a statute cannot be changed by administrative regulation.” State ex rel. Swart v. Casne (1977) 172 Mont. 302, 308, 564 P.2d 983, 986.
Likewise, in Bick v. State, Department of Justice (1986) 224 Mont. 455, 458-59, 730 P.2d 418, 421, we held that:
A valid rule must meet both prongs of a two-prong test to determine whether or not it harmonizes with its enabling legislation. It must not engraft additional and contradictory requirements on the statute, and it must not engraft additional non-contradictory requirements on the statute which were not contemplated by the legislature. Bell v. Department of Licensing, supra, 182 Mont. at 23, 594 P.2d at 333. The rule also must be reasonably necessary to effectuate the purpose of the statute. Board of Barbers of the Department of Professional and Occupational Licensing v. Big Sky College (Mont. 1981), 626 P.2d 1269, 1270, 38 St. Rep. 621, 623.
The requirement by Administrative Rule that an individual’s psychiatric condition pose a significant danger to herself or others before she is entitled to reimbursement for inpatient psychiatric care en- *167 grafts an additional requirement on its enabling statute. That additional requirement is, therefore, without effect.
There is considerable cause for concern that had the hearing examiner, the District Court, and the majority of this Court not focused completely on the administrative requirement of “significant danger,” and instead, focused simply on the statutory requirement that hospitalization be “medically necessary,” the outcome in this case may have been different.
I note, for example, that the hearing examiner found that, prior to her hospitalization, D.B.B. had digressed into fantasy and was having nightmares; sexually acted out at school' with her friends; was observed on the playground trying to call up the devil; and had been followed in out-patient therapy for the previous two years. As a result of sexual abuse by her uncle and emotional abuse by her father, she was diagnosed as suffering from post-traumatic stress disorder. Three mental health professionals recommended that she be placed in inpatient treatment. At the time that SRS concluded that hospitalization was no longer medically necessary, D.B.B. was being treated for anger, depression, and oppositional behavior. She had frequent mood swings, decreased self-esteem, felt overwhelmed by her environment, and she felt worthless, helpless, and hopeless. She suffered from flashbacks and disruptive recollections of past events of sexual abuse, she experienced dissociative episodes, outbursts of anger and aggression, marked difficulty concentrating, play themes consisting of violence, avoided dealing with feelings, was unable to express feelings openly, and she was overly anxious.
Those health care providers from Shodair who treated D.B.B. testified, according to the hearings examiner:
[H]ow critical it was that [D.B.B.] have a continuity of care with time for relationships of trust and confidence to develop. Shodair provides it would have been counterproductive to have allowed [D.B.B.] to stay at Shodair only two weeks and then transfer her to a residential treatment facility.
The hearing examiner also agreed with Shodair that:
[U]nlike MHMA reviewers or Dr. Osborne, the Shodair staff dealt directly with [D.B.B.] and, therefore, knows a good deal more about the child than the MHMA reviewers. ...
Finally, the following entries from D.B.B.’s medical records made during the period in question suggest that, at a minimum, continued inpatient treatment was “medically necessary”:
*168 08/29 During play therapy DBB played with puppets and a baby doll. The puppets tucked the baby in bed, but one puppet made too much noise and woke the baby. The puppet then had to be killed and was buried in the sand and left there. Shodair Exhibit I, entry for 8/29. Cheryl Ronish, DBB’s primary therapist and a master’s degree social worker, testified that: “[A] violent theme ran through all of [DBB’s] play. Often she would be the victim and then she would switch to be the victimizer, people were hurt, usually the puppets or her. ...” Hearing Transcript, p. 309.
08/31 During activities therapy, DBB continued to exhibit swings in mood. She was having difficulty with her feelings, but was unable to put words to those feelings. DBB needed redirection in all areas and discontinued activities after participating for only a few minutes. Shodair Exhibit J, entry for 8/31. On the same day DBB expressed anger and used foul language with the nursing staff. DBB stated she did not want to go home and stated that she feared she would kill someone if she returned home. DBB told the nursing staff, “I’ve killed people, the police and everyone know what I’ve done.” DBB was given a pillow and allowed to use the quiet room to discharge her anger. She hit the pillow against the wall and was observed kicking the wall and head butting the wall. Dr. Larson, DBB’s child psychiatrist, testified at the hearing that Shodair considered this to be “very dangerous behavior.” Hearing Transcript, p. 203. DBB was then taken to the punching bag where she “wailed on it.” The child care worker noted that DBB had homicidal fears and appeared to have delusional thinking. Shodair Exhibit G, entry for 8/31.
09/03 During the evening of 9/3 DBB said she was on suicide precautions for biting herself. She hit a peer, then started talking about “wanting to kill somebody, anybody. I’ve done it and will do it again, my dad even knows.” Shodair Exhibit G, entry for 9/3. 09/06 The weekly treatment plan review for 9/6, which is a part of Shodair Exhibit J, states that DBB was “still unable to express anger appropriately and has a potential to hurt others.” It also noted that DBB talked “a lot about violence.”
09/07 DBB stated that she wanted to be placed on suicide precautions, and would do it by biting and hitting herself. She was talking with her peers about how the Indians had killed the white man in her town. Shodair Exhibit G, entry for 9/7.
*169 09/14 During activities therapy DBB continued to have great variations in mood, and her moods could change within a single activity. There appeared to be no way of predicting when this was going to happen. DBB continued to close herself down when overwhelmed by her feelings, and refused to speak to staff at such times. DBB had particular difficulty while playing miniature golf. She appeared to be very preoccupied and needed constant redirection from staff, which she did not easily accept. At times staff had to physically intervene in order to get DBB back on task, and when DBB was touched she would become very hostile. Shodair Exhibit K, entry for 9/14. [The activities therapist] testified as follows about this incident:
... we were playing miniature golf at Mr. T’s and DBB was having a very difficult time attending to the activity. There was one instance where when I tried to call her back to that activity there was absolutely no response from her, she had her back to me and it was as if she didn’t hear anything I was saying. I called her name four times, she still didn’t respond, I finally had to touch her and then she was very hostile toward me at that point. A lot of just this verbal barrage came at me and this extremely fearful reaction in her entire body posturing that looked as if she could strike out at any minute. She did not reveal anything at that point in time and did not seem able to talk right then but it was on that same day that she spoke about the dad possibly beating the shit out of her if she indeed talked about things that had happened to her. So it looked like this was a time when she is reflecting on a lot of what’s happened to her. Possibly having flashbacks and fortunately is able to begin disclosing some of what’s happening to her. Hearing Transcript, pp. 355-56.
The problem with the result in this case is that none of these facts have been analyzed in terms of whether they made continuing hospitalization “medically necessary” without the additional requirement of proving medical necessity by establishing significant danger according to the department’s policy guidelines which were at best indecipherable and at worst a classic example of a bureaucratic mind run amok.
Lost in the shuffle of bureaucratic rules and guidelines was the only real consideration which was relevant in this case. That was whether D.B.B.’s continued hospitalization was medically necessary. *170 Her treating physicians said, “Yes.” Her records would indicate that it was. Yet that question was never answered.
For these reasons, I would reverse and vacate the decision of the hearing examiner based on an incorrect application of the law to the facts in this case and remand for further consideration based on the correct criteria for medicaid reimbursement which is set forth at § 53-6-101(6), MCA.
JUSTICE HUNT joins in the foregoing dissenting opinion.